1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10
11

MASA NATHANIEL WARDEN,

No.  2:19-cv-00431 MCE AC PS

12

Plaintiff,

13

v.

FINDINGS AND RECOMMENDATIONS

14

B. COWAN; W. WILLIAMS; and N. WEAVER,

15
16

Defendants.

17
18

Plaintiff, a state prisoner, is proceeding in this action pro se and in forma pauperis and the

19

case was accordingly referred to the undersigned by Local Rule 302(c)(21).  Defendants have

20

moved for summary judgment.  ECF No. 43.  Plaintiff filed an opposition to the motion, ECF No.

21

48, and defendants replied.  ECF No. 49.  Plaintiff filed an unauthorized surreply.  ECF No. 50.

22

Based on the analysis below, defendants' motion should be GRANTED in part, as to defendant

23

W. Williams only, and otherwise DENIED.

24

**I.      Complaint and Procedural Background**

25

This case proceeds on the basis of the First Amended Complaint ("FAC"), ECF No. 13.

26

On screening pursuant to the in forma pauperis statute, the undersigned found that the FAC stated

27

a Fourth Amendment claim for use of excessive force against Redding Police Officers B. Cowan,

28

N. Weaver, and W. Williams.  ECF No. 17.  Plaintiff was given the opportunity to amend the

1   complaint or to proceed only on those claims and against those defendants identified by the court.

2   Id.  Plaintiff chose to move forward with the FAC as limited by the screening order, and

3   defendants filed an answer.  ECF No. 33.

4        Plaintiff alleges that on July 23, 2018, one of the officers—he states that he is unsure

5   which one—shot him once while he had his arms in the air and was screaming that he was not

6   armed.  He fell to the ground, and all three officers "acting in cohort" proceeded "in unison" to

7   shoot him 17 times.  Id. at 3, 5.

8        Correctional records attached to the FAC indicate that the shooting occurred in connection

9   with plaintiff's arrest.  Id. at 10.  According to comments in the prison records, which were based

10   on Redding Police Department reports, officers responded after plaintiff punched an individual,

11   burglarized a residence, and started challenging people to fight.  Id.  "When officer's [sic] arrived

12   [plaintiff] was uncooperative and showed behaviors indicative that he had a gun and was going to

13   shoot officers which lead to Officers shooting [him] multiple times.  It was discovered [plaintiff]

14   did not have a gun.  [Plaintiff] was subsequently transported to a medical facility for treatment."

15   Id.

16        Plaintiff alleges that he was shot because he is black.  Id. at 6.  He states that he was

17   unarmed and posed no immediate threat; and that, due to the number of recent shootings of other

18   black people by white police officers, he was trying to make it clear that he was unarmed at the

19   time he was shot.  Id. at 3, 6.  He alleges that as a result of the shooting, he is now "permanently

20   disabled" and has to use a wheelchair and a walker to get around; he also suffers daily pain from

21   multiple bullets that remain in his body.  Id. at 3-4.

22        Discovery in this case has concluded, and the instant motion for summary judgment was

23   filed on July 24, 2020.  ECF No. 43.

24                    **II.     Standard for Summary Judgment**

25        Summary judgment is appropriate when the moving party "shows that there is no genuine

26   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

27   Civ. P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden

28   of proving the absence of a genuine issue of material fact."  In re Oracle Corp. Sec. Litig., 627

2

1    F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The

2    moving party may accomplish this by "citing to particular parts of materials in the record,

3    including depositions, documents, electronically stored information, affidavits or declarations,

4    stipulations (including those made for purposes of the motion only), admissions, interrogatory

5    answers, or other materials" or by showing that such materials "do not establish the absence or

6    presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

7    support the fact."  Fed. R. Civ. P. 56(c)(1).

8         Summary judgment should be entered, "after adequate time for discovery and upon

9    motion, against a party who fails to make a showing sufficient to establish the existence of an

10   element essential to that party's case, and on which that party will bear the burden of proof at

11   trial."  Celotex, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element

12   of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  In such

13   a circumstance, summary judgment should "be granted so long as whatever is before the district

14   court demonstrates that the standard for the entry of summary judgment, as set forth in Rule

15   56(c), is satisfied."  Id.

16        If the moving party meets its initial responsibility, the burden then shifts to the opposing

17   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

18   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  In attempting to establish the

19   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

20   of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

21   admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

22   Civ. P. 56(c).  The opposing party must demonstrate that the fact in contention is material, i.e., a

23   fact "that might affect the outcome of the suit under the governing law," Anderson v. Liberty

24   Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809

25   F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a

26   reasonable jury could return a verdict for the nonmoving party," Anderson, 477 U.S. at 248.

27   In the endeavor to establish the existence of a factual dispute, the opposing party need not

28   establish a material issue of fact conclusively in its favor.  It is sufficient that "'the claimed

3

factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" T.W. Elec. Service, Inc., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Cent. Costa County Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289).

### III.    Statement of Undisputed Facts

Unless otherwise specified, the following facts are either expressly undisputed by the parties or have been determined by the court, upon a full review of the record, to be undisputed by competent evidence. Defendants' statement of undisputed facts is located at ECF No. 43-2, and is supported by multiple declarations, medical reports dated December 31, 2018 (ECF No. 43-8 at 8-9), a transcript form plaintiff's felony plea and sentencing dated August 21, 2018 (id. at 127-40), and independent report from the Shasta County Office of the District Attorney dated May 23, 2019 (id. at 142-47). See ECF Nos. 43-3 through 43-8. Plaintiff did not submit a statement of undisputed facts or specifically contest defendants' statement of undisputed facts, though he did attach various police and investigation reports to his opposition. ECF No. 48.

This case involves an incident that took place on July 23, 2018, in Redding, California. Plaintiff Masa Warden injected himself with drugs and had crystal methamphetamine in his system on that date. Deposition of Masa Nathanael Warden, taken April 28, 2020 ("Warden

1   Depo.") (ECF No. 43-7) at 27:5-26, 28:1-6).  Early in the morning, plaintiff jumped into the pool

2   at Shasta High School and swam fully clothed, leaving the pool area in his wet clothes with a pair

3   of blue goggles on his forehead, and a white towel around his waist.  Warden Depo. 57:19-25,

4   59:1-19, 65:1-10, 68:16-24.  When plaintiff was leaving the school, he was confronted by John

5   Decker, with whom a fight ensued involving plaintiff punching Mr. Decker multiple times and

6   threatening to kill him.  Warden Depo. 60:2-25, 61:15-23, 62:1-8, 65:20-25, 66:6-11.  Decker

7   called 9-1-1 and reported the attack, advising the dispatcher that the suspect was a black male

8   adult, short hair, approximately 5'9" to 5'10" tall, wearing a gray or white shirt, khaki pants, and

9   a pair of blue swimming goggles on his head.  Meanwhile, plaintiff fled the scene.  Warden Depo.

10  61:5-8, 62:16-18; Declaration of Will Williams ("Williams Decl.") ¶4; Declaration of Bryan

11  Cowan ("Cowan Decl.") ¶4; Declaration of Nick Weaver ("Weaver Decl.")  ¶4.

12         Following the altercation with Decker, a witness observed a black male adult behind

13  Shasta High School between the football and baseball fields, heading toward Mary Street, who

14  was approximately 6'0" tall and wearing a short sleeve shirt and khaki pants.  ECF 13:9-10 (First

15  Amended Complaint, Exhibit A- Classification Committee Chrono); Warden Depo. 62:19-23,

16  69:5-10, 16-23, 70:5-14; Williams Decl. ¶¶4-5.  Redding Police Officer Brian Moore responded

17  to Shasta High School around 6:00 a.m. on July 23, 2018 to interview Decker regarding the

18  assault, while Corporal Will Williams conducted a search of the Sacramento River Trail and "old

19  rail trail" areas looking for the suspect.  Williams Decl. ¶¶ 5-9.  Around 7:38 a.m., Shasta High

20  School employee Ryan Brown called 9-1-1 and reported that, while searching for the suspect in

21  the area around the high school on a Kubota tractor, they spotted a man matching plaintiff's

22  description entering the backyard of a private residence at 310 Overhill Drive.  ECF No. 45-5 at

23  6.  Dispatchers notified officers over the police radio that the suspect of the Shasta High School

24  incident that morning had been seen entering the backyard of a residence at 310 Overhill Drive,

25  but officers were unable to locate plaintiff when they responded and conducted a search of the

26  premises.  ECF No. 43-5 ("Sheldon Report") at 2.

27         Around 8:29 a.m., Nueme Wells called 9-1-1 and reported that her surveillance cameras

28  showed an adult intruder had come through the gate at her 4-plex residence located at 250

1    Overhill Drive around 6:00 a.m. that morning, had left a backpack on her porch, and was seen on

2    tape watching a female tenant/neighbor leave her apartment.  ECF 13 at 9-10; Sheldon Report at

3    2.  Dispatchers notified officers via police radio of the intruder reported by Wells, and advised

4    that the description was a black adult male.  Williams Decl. ¶¶10-11.

5         Corporal Williams heard the transmission and radioed Officer Moore stating that the

6    backpack left behind could have been left by the same suspect responsible for the attack on John

7    Decker at Shasta High School that morning, and Officer Moore was dispatched to investigate.

8    Williams Decl. ¶¶l0-11.  At or around 8:38 AM, Nueme Wells called 9-1-1 again and reported

9    that one of her tenants at the 4-plex, Cheri Lovejoy, had been burglarized that morning, and swim

10   goggles were left on the bed.  Sheldon Report at 2.  Officer Moore arrived at 250 Overhill Drive

11   and conducted a burglary report.  Id.

12        Plaintiff fled to the Sacramento River Trail, where he began exercising, running sprints,

13   and went for a swim, fully clothed, in the Sacramento River.  Warden Depo. 29:20-25, 30:4-6.

14   Around 9:00 a.m., a call for service was relayed from the Sacramento River Trail indicating a

15   male wearing a blue shirt and light-colored pants had been acting strangely on the Sacramento

16   River Trail, appeared to be on drugs, was acting agitated, talking to himself and asking people if

17   they wanted to fight.  Williams Decl. ¶12.  Around 9:15 a.m., Officer Moore advised over the

18   radio that the suspect wanted for the attack on John Decker at Shasta High School was also

19   wanted for trespass and burglary of a residence at 250 Overhill Drive based on surveillance

20   footage that had been obtained by police at both crime scenes.  Id. at ¶13.  Officer Moore further

21   advised that the suspect was likely also the same person who was causing problems along the

22   Sacramento River Trail.  Id.

23        Officer Little, who was the school resource officer for Shasta High School, obtained video

24   surveillance footage of the Decker attack and positively identified plaintiff walking up from

25   Overhill Drive from the Sacramento River Trail access point toward Mary Street.  Williams Decl.

26   ¶14.  Corporal Williams was 2-4 blocks away from the area at the time and quickly dispatched to

27   the location in his clearly marked Redding Police Department SUV.  Id. at ¶15.  While Corporal

28   Williams was on his way to attempt contact with the plaintiff on Mary Street, Officer Moore

1    advised over the radio that the plaintiff was wanted and arrestable for battery of a school

2    employee, residential "cat" burglary, and harassing citizens along the Sacramento River Trail.

3    Williams Decl. ¶¶16-17.  Corporal Williams found plaintiff on the 700 block of Mary Street near

4    Freedom High School and radioed that he had located plaintiff.  Williams Decl. ¶18.  Corporal

5    Williams parked his SUV in the roadway and exited his vehicle wearing a full Redding Police

6    Department uniform. ¶¶19-20.

7    Officer Williams identified himself as police and asked to talk to plaintiff, with his hand

8    on his gun in the low ready position.  Williams Decl. ¶20.  Plaintiff began walking hurriedly

9    toward Williams waving his arms and throwing unknown items that he had in his hands.

10   Williams Decl. ¶¶21-23.  Because plaintiff's clothes were wet, he was holding them up with both

11   hands.  Warden Depo. 78:1-25, 79:1-25.  When Corporal Williams saw plaintiff reach for his

12   waistband, he radioed that the suspect had a gun in his waistband.  Williams Decl. ¶¶23-25.

13   Officers Cowan and Weaver, who were already a few blocks from Corporal Williams' location,

14   heard dispatch advise that plaintiff had a gun in his waistband and began responding Code 3 with

15   lights and sirens toward Corporal Williams.  Cowan Decl. ¶¶16-17; Weaver Decl. ¶¶15-16.

16   Officer Williams was giving plaintiff commands to stop and to show his hands, which

17   plaintiff ignored and instead continued moving his body.  Warden Depo. 81:4-25, 100:21-23,

18   101:1-21; Williams Decl. ¶¶26-30.  Plaintiff saw that Corporal Williams had his gun out, and

19   turned his shoulder to hide his chest while holding his waistband to keep his pants from falling

20   down.  Warden Depo. 81:1-25; Williams Decl. ¶¶29-30.  Corporal Williams fired one round from

21   his department issued duty weapon at plaintiff, and plaintiff immediately fell hard to the ground.

22   Warden Depo. 81:24-25, 82:1-15; Williams Decl. ¶¶30-32.  The bullet from Corporal Williams'

23   weapon did not actually hit plaintiff.  Warden Depo. 81:25, 82:1-5.

24   Immediately after firing his weapon, Corporal Williams made multiple calls over the

25   police radio that shots had been fired and there was one down and medical was requested.

26   Warden Depo. 82:16; Williams Decl. ¶¶ 33, 34; Waver Decl. ¶17.  Officers Cowan and Weaver

27   arrived on the scene nearly simultaneously and within seconds of Corporal Williams' "shots

28   fired" radio call.  Williams Decl. ¶35; Cowan Decl. ¶19; Weaver Decl. ¶18.  Officers Cowan and

Weaver, each dressed in full Redding Police Department uniforms, responded to the scene in their marked Redding Police Department patrol vehicles, finding plaintiff lying on the ground, partly on his back and partly on his side, while being given commands not to move.  Cowan Decl. ¶¶19-20; Weaver Decl. ¶¶19-20.  Corporal Williams told Officers Cowan and Weaver that plaintiff had a gun his waistband and had been shot once.  Williams Decl. at ¶36; Cowan Decl. ¶20; Weaver Decl. ¶20.  The officers continued giving plaintiff commands to not move, and to show his hands. Williams Decl. ¶¶37-38; Cowan Decl. ¶¶21-22; Weaver Decl. ¶¶19, 21-22.

Plaintiff made a movement with his upper body.  Warden Depo. 83:1-25, 84:1-25; Williams Decl. ¶¶39-40; Cowan Decl. ¶¶21-22, 24-26; Weaver Decl. ¶¶19, 21-22.  Cowan and Weaver simultaneously fired their department-issued duty weapons at the plaintiff.  Williams Decl. ¶¶39-40; Cowan Decl. ¶¶24-29; Weaver Decl. ¶¶21-27.  Officer Cowan and officer Weaver each fired several rounds at plaintiff.  Cowan Decl. ¶28; Weaver Decl. ¶26; Sheldon Report at 7. Immediately after Officers Cowan and Weaver discharged their weapons, a radio call was made that additional shots had been fired and medical aid was requested.  Williams Decl. ¶¶41-42; Cowan Decl. ¶¶30-31; Weaver Decl. ¶¶28-29.  A fourth police unit arrived on scene within seconds of the second "shots fired" radio call, at which time plaintiff was placed under arrest and emergency first-aid was rendered until the paramedics arrived.  Warden Depo. 97:13-25, 98:1-8, 102:21-25, 103:1-7, 106:2-10.

Plaintiff was transported from the scene to Mercy Medical Center in Redding, where he remained for about three weeks and was treated for his injuries.  Warden Depo. 106:2-10. Plaintiff was placed under arrest at Mercy Medical Center on August 11, 2018, following his discharge from the hospital, and was booked into the Shasta County Jail.  Warden Depo. 106:5-22, 108:6-9.  Plaintiff was charged with one count of obstructing or resisting arrest, a felony, in violation of Cal. Penal Code § 69 for his interaction with Corporal Williams; two counts of resisting, obstructing, or delaying an officer, a misdemeanor, in violation of Penal Code § 148(a)(l) for his interactions with Officers Cowan and Weaver; one count of criminal threats, a felony, a violation of Penal Code § 422 for the threats he made against John Decker; one count of first-degree residential burglary, a felony, in violation of Penal Code § 459 for the burglary of

1   Cheri Lovejoy's residence; one count of assault with force likely to cause great bodily injury, a

2   felony, a violation of Penal Code § 245(a)(4) for the attack on John Decker; and one count of

3   battery on a school employee, a misdemeanor, in violation of Penal Code § 243.6, also for the

4   attack on John Decker.  Sheldon Decl. Exhibit A; Warden Depo. Exhibit F (SCSC Case No. 18-

5   05051); Warden Depo Exhibit E (SCSC Case No. 18-05052).

6          On August 21, 2018, during his first appearance in Shasta County Superior Court, while

7   represented by a public defender, plaintiff plead no contest to felony resisting arrest with respect

8   to Corporal Williams in violation of Penal Code § 69, as well as felony criminal threats in

9   violation of Penal Code § 422, and felony first-degree residential burglary in violation of Penal

10  Code § 459.  Warden Depo. 109:8-10, 110:10-15, 111:17-25, 112:1-13, 113:1-14, 117:3-15,

11  Exhibit E, Exhibit F, Exhibit G.  Plaintiff and his attorney stipulated on the record that the factual

12  basis upon which he entered his plea of no contest to resisting arrest in violation of Penal Code §

13  69 was the Summary of Events prepared by Det. Julie Soksoda of the Shasta County Sheriff's

14  Office, attached to the Criminal Complaint in Shasta County Superior Court Case No. 18-05051.

15  Declaration of Patrick L. Deedon, ¶14 and Exhibit 13 (Sentencing Transcript, ECF No. 43-8 at

16  133-35).  Plaintiff and his attorney stipulated on the record that the factual basis upon which he

17  entered his pleas of no contest to criminal threats in violation of Penal Code § 422 and no contest

18  to first-degree residential burglary in violation of Penal Code § 459 was the Investigative

19  Narrative, Declaration for Arrest Warrant, and Affidavit in Support of Ramey Warrant prepared

20  by Investigator Jonathan Sheldon of the Redding Police Department, as well as the Arrest

21  Warrant issued pursuant thereto by the Hon. Stephen Baker of the Shasta County Superior Court,

22  all of which were attached to the Criminal Complaint in Shasta County Superior Court Case No.

23  18-05052.  Id.  The Shasta County District Attorney's Office investigated the officer-involved

24  shooting which forms the basis of plaintiff's FAC and declined to prosecute any of the

25  defendants, finding that all three officers were justified in their actions and that the shooting was

26  lawful.  Id. at ¶15 and Exhibit 14 (District Attorneys' Report).

27  ////

28  ////

9

1

#### IV.    Analysis

2

   A.  <u>Claims Against Officer Williams are *Heck*-Barred</u>

3      Defendants contend that plaintiff's claims against Corporal Williams are barred by <u>Heck</u>

4   <u>v. Humphrey</u>, 512 U.S. 477 (1994).  ECF No. 43-1 at 12-13.  Under <u>Heck</u>, a prisoner may not

5   proceed on a claim for damages under § 1983 if a judgment favoring plaintiff "would necessarily

6   imply the invalidity of his conviction or sentence."  <u>Heck</u>, 512 U.S. at 487.  In such a case,

7   plaintiff is foreclosed from proceeding absent proof that the conviction or sentence has been

8   reversed, expunged or invalidated.  <u>Id.</u> at 486–487.  However, "if the district court determines that

9   the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding

10   criminal judgment against the plaintiff, the action should be allowed to proceed ...."  <u>Id.</u> at 487.

11   As an illustration of the rule's application, the <u>Heck</u> Court explained that an individual convicted

12   of resisting arrest, defined as intentionally preventing a peace officer from effecting a lawful

13   arrest, would be barred from bringing a claim for damages for unlawful arrest.  <u>Id.</u> at 487 n.6.

14   That result is compelled by the fact that plaintiff, in order to prevail on his § 1983 claim, would

15   have to negate an element of his conviction offense: the lawfulness of the arrest.  <u>Id.</u>

16      When a plaintiff bringing an excessive use of force claim has been convicted of resisting

17   arrest, application of the <u>Heck</u> bar turns on the relationship between the arrest that has been

18   determined lawful in the criminal case and the use of force alleged to have violated plaintiff's

19   rights.  For example, an "allegation of excessive force by a police officer would not be barred by

20   <u>Heck</u> if it were distinct temporally or spatially from the factual basis for the person's conviction."

21   <u>Beets v. County of Los Angeles</u>, 669 F.3d 1038, 1042 (9th Cir. 2012); <u>see also</u> <u>Sanford v. Motts</u>,

22   258 F.3d 1117, 1120 (9th Cir. 2001) ("[e]xcessive force used after an arrest is made does not

23   destroy the lawfulness of the arrest").  Similarly, <u>Heck</u> does not bar an excessive force claim

24   based on allegations that the force used was unreasonable in relation to the degree of resistance to

25   arrest.  <u>Hooper v. County of San Diego</u>, 629 F.3d 1127, 1133 (9th Cir. 2011).  Such a claim, if

26   proven, would not imply the invalidity of a conviction for resisting arrest.  <u>Id.</u>  In sum, <u>Heck</u> does

27   not bar claims against police for excessive force arising from conduct independent of the facts

28   giving rise to a plaintiff's prior conviction.  <u>Smith v. City of Hemet</u>, 394 F.3d 689, 698 (9th Cir.

1  2005)–99 (9th Cir.) (en banc), cert. denied, 545 U.S. 1128 (2005).

2         In contrast, a § 1983 action must be dismissed if the criminal conviction stands and arises

3  "out of the same facts ... and is fundamentally inconsistent with the unlawful behavior for which

4  section 1983 damages are sought ...." Beets, 669 F.3d at 1042 (internal citations and quotation

5  marks omitted) (barring plaintiff's § 1983 claim for excessive force when decedent killed by

6  officer but accomplice convicted of aiding and abetting assault on peace officer).  Where the

7  alleged wrongful conduct that serves as the basis of the § 1983 claim is very "closely interrelated"

8  with the act for which plaintiff was convicted, the claim is Heck-barred.  Cunningham v. Gates,

9  312 F.3d 1148, 1154 (9th Cir. 2002), as amended on denial of reh'g (Jan. 14, 2003) (applying

10  Heck bar where there was no break between the plaintiff's provocative act of firing on the police

11  and the police response that he claimed was excessive).

12         The application of Heck, as the foregoing authorities demonstrate, is a highly fact-

13  dependent inquiry that turns on the precise factual basis for the conviction.  In the case at bar,

14  plaintiff pled no contest to a charge of violating Cal. Penal Code § 69 (resisting or obstructing an

15  officer), and was convicted.  A conviction under Cal. Penal Code § 69, which makes it a crime to

16  resist, obstruct, or delay a peace officer in the performance of his or her duties, "can be valid even

17  if, during a single continuous chain of events, some of the officer's conduct was unlawful,"

18  because the conviction itself "requires only that some lawful police conduct was resisted, delayed,

19  or obstructed during that continuous chain of events."  Hooper, 629 F.3d at 1131 (citing Yount v.

20  City of Sacramento, 43 Cal. 4th 885 (2008)).  The conduct on which a no contest plea to such a

21  charge is based may coexist with conduct supporting a Section 1983 claim insofar as "two

22  isolated factual contexts exist."  Id. at 1132.  When a case involves a plea of no contest, as it does

23  here, the question of whether the Heck bar applies turns on exactly what facts the plea was based

24  on; the facts that establish the foundational basis for the plea cannot be undermined by the §1983

25  claim.  See Winder v. McMahon, 345 F. Supp. 3d 1197, 1203 (C.D. Cal. 2018).

26         The court previously construed plaintiff's FAC as alleging an excessive force claim under

27  the Fourth Amendment.  ECF No.15 at 4-5.  The Fourth Amendment analysis requires balancing

28  the "nature and quality of the intrusion" on a person's liberty with the "countervailing

11

1   governmental interests at stake" to determine whether the use of force was objectively reasonable

2   under the circumstances. Graham v. Connor, 490 U.S. 386, 396 (1989). "[T]he 'reasonableness'

3   inquiry in an excessive force case is an objective one: The question is whether the officers'

4   actions are 'objectively reasonable' in light of the facts and circumstances confronting them[.]"

5   Id. at 397 (citations omitted); see Rodriguez v. City of Los Angeles, 891 F.3d 776, 797 (9th Cir.

6   2018) ("We determine whether the Fourth Amendment has been violated by assessing the

7   objective reasonableness of the force used, balancing the degree of intrusion against the

8   government's interest.").

9        Based on a comparative review of plaintiff's plea and his §1983 claims, the undersigned

10   concludes that the claim against Corporal Williams is Heck-barred. In relevant part, plaintiff's

11   plea stipulated that he was "uncooperative" with Williams, that he made movements "with his

12   hand as if he was preparing to draw an unknown type of weapon from his waistband area," that

13   Williams gave him "multiple commands to show his hands and to get out his hands out of his

14   pocket," but that he "continued to make movements to the area of his waistband," and that

15   Williams "fired one round, causing [plaintiff] to fall to the ground." ECF No. 43-8 at 134-35

16   (Sentencing Hearing Transcript), ECF No. 43-7 at 127-28 (Criminal Complaint Summary of

17   Events). The actions plaintiff stipulated to in his plea, particularly the use of his hands to appear

18   as if he was drawing a weapon, make it impossible to separate plaintiff's conduct giving rise to

19   his conviction and Corporal Williams' use of force in discharging his weapon at plaintiff. The

20   factual basis supporting the conviction and the factual basis of the excessive use of force claim

21   are inextricably intertwined. Having stipulated to these facts as the basis for his conviction,

22   plaintiff cannot now challenge Corporal Williams' use of force in these events in a §1983 action;

23   such a challenge necessarily goes to the validity of the conviction and is barred by Heck. Plaintiff

24   does not allege that his conviction has been vacated or overturned. Thus, this claim cannot

25   proceed.

26        B. Officers Weaver and Cowan are Not Entitled to Summary Judgment on the Merits

27        Defendants argue that plaintiff's remaining Fourth Amendment unlawful force claims

28   against Officers Weaver and Cowan fail on the merits and that they are entitled to summary

1  judgment.  ECF No. 43-1 at 14-20.  "An objectively unreasonable use of force is constitutionally

2  excessive and violates the Fourth Amendment's prohibition against unreasonable seizures."

3  Torres v. City of Madera, 648 F.3d 1119, 1123–24 (9th Cir. 2011).  The Fourth Amendment

4  requires police officers making an arrest to use only an amount of force that is objectively

5  reasonable in light of the circumstances facing them.  Tennessee v. Garner, 471 U.S. 1, 7–8

6  (1985).

7      Excessive force cases often turn on credibility determinations, and "[the excessive force

8  inquiry] 'nearly always requires a jury to sift through disputed factual contentions, and to draw

9  inferences therefrom.'"  Smith, 394 F.3d at 701 (alteration in original) (quoting Santos v. Gates,

10  287 F.3d 846, 853 (9th Cir. 2002)).  Therefore, "'summary judgment or judgment as a matter of

11  law in excessive force cases should be granted sparingly.'"  Id.  The Ninth Circuit has "held

12  repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury."

13  Liston v. County of Riverside, 120 F.3d 965, 976 n.10 (9th Cir. 1997), as amended (Oct. 9, 1997)

14  (citations omitted).  In evaluating a claim of excessive force, a court must balance the "nature and

15  quality of the intrusion" against the "countervailing government interests at stake."  Graham v.

16  Connor, 490 U.S. 386, 396 (1989) (citations omitted).  Factors to be considered in assessing the

17  government interests include, but are not limited to, "the severity of the crime at issue, whether

18  the suspect poses an immediate threat to the safety of the officers or others, and whether he is

19  actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.

20      In this case, the facts related to Officers Weaver and Cowan's use of force are disputed,

21  and the undisputed facts are not clearly favorable to the officers.  On summary judgment the

22  undisputed facts must be viewed in the light most favorable to plaintiff.  Walls, 653 F.3d at 966.

23  Here, those facts include that both Officers Weaver and Cowan discharged multiple rounds of

24  bullets at an unarmed black man while he was on the ground and (as far as they knew) had

25  already been shot.  Cowan Decl. ¶¶ 22, 28; Weaver Decl. ¶¶ 19, 26.  These facts do not support

26  judgment for the defendants as a matter of law.

27      Even so, the disputed facts in this case make summary judgment inappropriate.  For

28  example, plaintiff testified that, despite the officers' claims that he was reaching toward pockets,

13

1   the pants he was wearing did not have pockets.  Warden Decl. 104:15-22.  Plaintiff testified that

2   while the officers were yelling to put his hands out, he told them his hands were already out.  Id.

3   Plaintiff testified that he said "I don't have a weapon.  I don't have a weapon.  I don't have a

4   weapon."  Id.  He testified that when he was on the ground he pushed up just to keep telling them

5   that he did not have a weapon, "and then they shot me, and then they start laughing at the end."

6   Id., 105:1-4.  The officers do not agree to these assertions as undisputed facts, and thus central

7   facts surrounding the incident, which go directly to the reasonableness of the officers' use of

8   force, are in dispute.  Accordingly, summary judgment cannot issue.

9       C.  Qualified Immunity Does Not Defeat Plaintiff's Claims Against Weaver and Cowan

10          Defendants argue that qualified immunity protects Officers Weaver and Cowan because

11  they believed their lives were at risk when they fired their weapons at plaintiff.  ECF No. 43-1 at

12  20-23.  Government officials are immune "from liability for civil damages insofar as their

13  conduct does not violate clearly established statutory or constitutional rights of which a

14  reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

15  "Qualified immunity balances two important interests—the need to hold public officials

16  accountable when they exercise power irresponsibly and the need to shield officials from

17  harassment, distraction, and liability when they perform their duties reasonably."  Pearson v.

18  Callahan, 555 U.S. 223, 231 (2009).  Ideally, qualified immunity is determined at the earliest

19  possible stage in litigation to avoid unnecessary burden and expense.  Hunter v. Bryant, 502 U.S.

20  224, 227 (1991) (per curiam).

21          The Supreme Court has established a two-step inquiry for determining whether qualified

22  immunity applies.  Saucier v. Katz, 533 U.S. 194, 201 (2001) (overruled in part by Pearson, 555

23  U.S. 223).  First, a court must ask, "[t]aken in the light most favorable to the party asserting the

24  injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id.

25  Second, if the answer to the first inquiry is "yes," the court must ask whether the constitutional

26  right was "clearly established."  Id.  This second inquiry is to be undertaken in the specific

27  context of the case.  Id.  In Pearson v. Callahan, the Supreme Court removed any requirement that

28  the Saucier test be applied in a rigid order, holding "[t]he judges of the district courts and the

1    courts of appeals should be permitted to exercise their sound discretion in deciding which of the

2    two prongs of the qualified immunity analysis should be addressed first in light of the

3    circumstances in the particular case at hand." Pearson, 555 U.S. at 236.

4        "The plaintiff bears the burden of proof that the right allegedly violated was clearly

5    established." Tarabochia v. Adkins, 766 F.3d 1115, 1125 (9th Cir. 2014) (internal quotation

6    marks omitted). "To meet this standard the very action in question need not have previously been

7    held unlawful." Id. (internal quotation marks omitted). This is especially the case in the context

8    of alleged Fourth Amendment violations, where the constitutional standard of "reasonableness"

9    requires a fact-specific inquiry. Mattos v. Agarano, 661 F.3d 433, 442 (9th Cir. 2011) (en banc).

10   The court must determine "whether a reasonable officer would have had fair notice that the action

11   was unlawful[.]" Tarabochia, 766 F.3d at 1125 (internal quotation marks and brackets omitted).

12   At its base, "[t]he qualified immunity doctrine rests on a balance between, on the one hand,

13   society's interest in promoting public officials' observance of citizens' constitutional rights and,

14   on the other, society's interest in assuring that public officials carry out their duties and thereby

15   advance the public good." Beier v. City of Lewiston, 354 F.3d 1058, 1071 (9th Cir. 2004).

16       Here, defendants argue that "while it is clearly established that 'a police officer may not

17   seize an unarmed, nondangerous suspect by shooting him,' there is no case law to support a

18   finding that an officer violates the Fourth Amendment if he uses deadly force to seize a dangerous

19   suspect who posed a threat of serious physical harm." ECF No. 43-1 at 21, quoting Tennessee,

20   471 U.S. at 11. This argument is a nonstarter, because plaintiff alleges that he did not pose a

21   threat of serious harm because he was unarmed and lying on the ground at the time Officers

22   Cowan and Weaver fired their weapons. Indeed, it is undisputed that plaintiff was already on the

23   ground when Officers Cowan and Weaver shot him multiple times, as discussed above.

24   Defendants' argument does not accurately reflect the facts of this case.

25       The Ninth Circuit has repeatedly recognized that excessive force cases often turn on

26   credibility determinations, and that the excessive force inquiry "nearly always requires a jury to

27   sift through disputed factual contentions, and to draw inferences therefrom." Santos v. Gates, 287

28   F.3d 846, 853 (9th Cir. 2002). Where, as here, facts relevant to the reasonableness of force used

15

1  are disputed, the case cannot be resolved at summary judgment on qualified immunity grounds.

2  See Liston, 120 F.3d at 975; Santos, 287 F.3d at 853.  Accordingly, qualified immunity is not a

3  proper ground for summary judgment here.

4                                              **Conclusion**

5          Accordingly, for the reasons explained above, IT IS RECOMMENDED that defendants'

6  motion for summary judgment (ECF No. 43-1) be GRANTED as to Corporal Williams only, and

7  DENIED as to remaining the remaining defendants, Officers Cowan and Weaver.

8          These findings and recommendations are submitted to the United States District Judge

9  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one days

10  after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Id.; see also Local Rule 304(b).  Such a

12  document should be captioned "Objections to Magistrate Judge's Findings and

13  Recommendations."  Any response to the objections shall be filed with the court and served on all

14  parties within fourteen days after service of the objections.  Local Rule 304(d).  Failure to file

15  objections within the specified time may waive the right to appeal the District Court's order.

16  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57

17  (9th Cir. 1991).

18          IT IS SO ORDERED.

19  DATED: September 17, 2020

20                                              _____
                                                ALLISON CLAIRE
21                                              UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28

                                                    16